**USAA INVESTMENT MANAGEMENT COMPANY, Plaintiff,**

v.

**FEDERAL RESERVE BANK OF BOSTON, Federal Reserve Bank of New York, and David Trojanowski, Defendants.**

**No. H 90 CV 1049.**

United States District Court,
D. Connecticut.

Nov. 2, 1995.

Paul F. Ware, P.C., Thomas F. Hefferon, Goodwin, Proctor & Hoar, Boston, MA, for Plaintiff.

Martin C. Grant, New York City, for Defendant Federal Reserve Bank of N.Y.

GOETTEL, District Judge:

Plaintiff, USAA Investment Management Company, filed suit under the Expedited Funds Availability Act, 12 U.S.C. §§ 4001 *et seq.*, and the regulations promulgated thereunder, as well as under New York's Uniform Commercial Code, N.Y. UCC Law §§ 4–101 *et seq.*, seeking to recover approximately $75,000 from the Federal Reserve Bank of Boston, the Federal Reserve Bank of New York, and David Trojanowski (its customer), which it lost when a $75,000 check was dishonored by the paying bank and was not returned in time for Plaintiff to stop payment of these funds from Mr. Trojanowski's account.

Prior to trial, a default judgment was entered against Trojanowski, which was returned unsatisfied, and the Federal Reserve Bank of Boston was dismissed from the case. Thus, this case was tried to the Court on October 25 and 26, 1995, with the Federal Reserve Bank of New York as the only remaining defendant.

Having received documentary and testimonial evidence and stipulations of fact, having heard argument of counsel, and being otherwise advised in the premises, the Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

Plaintiff, USAA Investment Management Co. ("IMCO"), is a Delaware corporation located in San Antonio, Texas. IMCO is a registered investment adviser and a registered broker-dealer which is in the business of managing and advising certain mutual funds, including USAA Mutual Fund, Inc. ("Mutual Fund"). IMCO is a wholly-owned subsidiary of the United Services Automobile Association ("USAA"), of San Antonio, Texas. USAA is a membership corporation composed of officers in the Armed Forces and former officers.

The Defendant, Federal Reserve Bank of New York ("Fed New York"), is a corporation organized and existing under the laws of the United States with its principal place of business at 33 Liberty Street, New York, New York. Fed New York is, *inter alia,* in the business of processing checks for collection and return in the Second Federal Reserve District, which includes New York and Fairfield County, Connecticut. In 1988 and 1989, Fed New York maintained a regional check processing center at Jericho, New York (the "Jericho Office").

In 1988, approximately 45 billion checks were deposited for collection in the United States, of which the Federal Reserve Banks processed over 18 billion, or roughly 40 per cent. In the Second Federal Reserve District, Fed New York processed nearly eight million checks daily.

On December 13, 1988, IMCO received an application from defendant David Trojanowski ("Trojanowski") to open a money market fund with USAA Mutual Fund Company.

Enclosed with the application, was a third-party check dated December 9, 1988, made payable to David Trojanowski for $75,000, drawn on an account in the name of Juan Davila Gruijarro at the Connecticut Bank & Trust ("CBT"). Trojanowski had endorsed the Check on the reverse side. This Check is the item in controversy in this case ("the Check").

The application submitted by Trojanowski contained Trojanowski's name and what purported to be his date of birth, social security number,[1] and signature. The only address on the application was a post office box located in Westport, Connecticut. In processing the application, IMCO determined that USAA had an identification number belonging to Trojanowski's father as a member and that USAA had a record of a permanent address for his father in Providence, Rhode Island. No further due diligence on the application was conducted by IMCO.

Additionally, because Trojanowski was a relative of a USAA member with whom USAA had a permanent address on file, therefore making him an associate member, Trojanowski was allowed to open an account with check-cashing privileges despite the absence of a home address and the use of a third-party check. IMCO opened the requested account at Mutual Fund in the name of Dave Trojanowski ("Trojanowski Account").

IMCO then provisionally credited the Trojanowski Account with the amount of $75,000.00, and placed a 15–day hold on the credit. The purpose of the 15–day hold was to allow time for the Check to clear, so that IMCO could determine whether the Check was backed by sufficient funds. IMCO placed such holds on credits as a matter of policy. A book of blank checks which could be used for withdrawing funds was then sent to Trojanowski.

As was its usual practice, IMCO then submitted the Check to USAA Transfer Agency ("USAA TA"), a subsidiary of USAA, which processed all checks submitted to IMCO. USAA TA endorsed the Check on the re-verse side in an area reserved for collecting banks rather than the area reserved for the depositor's endorsement. It said, *inter alia*, "USAA TA.... ABSENCE ENDORSEMENT GUARANTEE." USAA TA placed additional internal routing numbers on the back of the Check running into areas reserved for other endorsements and somewhat obscuring the endorsement later placed by its bank. USAA TA also pre-encoded the $75,000 dollar amount with magnetic ink on the face of the Check prior to forwarding the Check to USAA Federal Savings Bank ("USAA FSB").

Each check has a routing number which is encoded in magnetic ink with a number assigned to the bank on which it is drawn by Rand McNally & Company under the auspices of the American Bankers Association ("ABA") and the Board of Governors of the Federal Reserve System. These routing numbers assist the forward collection of a check by routing it to the payor bank, through automated processing equipment through its unique ABA number.

IMCO or its agent USAA TA then deposited the Check into Plaintiff's "Special Account for the Benefit of Customers of USAA Investment Management Company" at USAA FSB, Account No. 000–2742–1, on December 14, 1988. USAA FSB was, accordingly, the "depositary bank" or bank of first deposit.

It was stipulated by the parties that USAA FSB is a wholly-owned subsidiary of USAA, but has no direct relationship with IMCO. With regard to processing checks, USAA FSB acted no differently with respect to IMCO checks than it did with respect to checks submitted to it by any other customer of that bank, other than the machinery used for endorsing and processing the IMCO checks.

USAA FSB had two machines which were capable of placing a depositary bank endorsement on checks and processing checks for forward collection. One machine was an encoder sorter which, *inter alia*, was adapted to place a depositary bank endorsement in

---

**1.** IMCO learned some months after Trojanowski opened the account that the social security num-ber noted on the application was incorrect.

the form and in the area on the back of the check mandated by Regulation CC, 12 C.F.R. Pt. 229, Appendix D. USAA FSB estimated that 80 percent of checks were processed with the encoder sorter.

USAA FSB had another machine which endorsed checks, a reader sorter, NCR 6760. This machine was not designed to place an endorsement wholly in the area on the back of the check designated for depositary banks in Regulation CC, Appendix D. This reader sorter was used to process checks with pre-encoded IMCO dollar amounts.

Since September 1988, when Regulation CC went into effect, USAA FSB, which was charged with adapting the check processing system, understood the endorsement standards set forth in Regulation CC, and USAA FSB had adopted a Check Hold Procedure Manual which correctly illustrated the endorsement standard contained in Regulation CC, Appendix D, both as to the form and proper placement of a depositary bank endorsement.

On December 14, 1988, USAA FSB endorsed the Check on the reverse side, with the following endorsement:

0007420000025217

314074269< USAA BANK

121488 SAN ANTONIO TX

The endorsement was placed on the Check by the NCR 6760 Reader Sorter, and was in the form of endorsements generally applied by that machine at USAA FSB. However, only the following portion of the endorsement was legible:

25217

74269< USAA BANK

The endorsement was partially illegible because of the mispositioning of it on the wrong end of the Check where it overlaid the routing information and other information already placed there by USAA TA.

That same day, USAA FSB sent the Check to the San Antonio Branch of the Federal Reserve Bank of Dallas ("Fed Dallas") for forward collection.

On Friday, December 16, 1988, Fed Dallas–San Antonio presented the Check for payment to Fed New York's Jericho Office.

The Check was listed in a cash letter as the fifth item, identified as check no. 39001949, between a check for $600.00 and a check for $98.02. (A cash letter is a letter of transmittal from one collecting bank to the next, listing all of the checks being transmitted in a particular batch). Upon receipt, Fed New York endorsed the Check.

On Tuesday, December 20, 1988, Fed New York then presented the Check for payment to the Federal Reserve Bank of Boston ("Fed Boston"), specifically to Fed Boston's regional check processing center at Windsor Locks, Connecticut. The Check was listed in a different cash letter in the amount of $19,-333,986.31, identified as check no. 95023393, and was listed again as falling between a check for $600.00 and a check for $98.02.

That same day, December 20, 1988, Fed Boston presented the Check to the drawee bank, CBT, for payment. CBT dishonored the Check for insufficient funds. (The Gruijarro account was a credit card account with a very small credit line against which checks could be drawn). At or about that time, CBT stamped the Check "Depositary Bank Unidentifiable" on the reverse side of the Check in an area which was otherwise blank, and, on December 22, 1988, CBT returned the Check to Fed Boston for credit as a "raw" return (not qualified for automated sorting to the depositary bank).

Once back at Fed Boston's Windsor Locks facility, the Check was sorted to a special handle pocket on the check processing equipment and was sent to Fed Boston's Windsor Locks adjustment department for further research in order to determine to which bank the Check should be returned. That research was completed within one day.

Although the Fed Boston–Windsor Locks adjusters were unable to identify the depositary bank, USAA FSB, they instead were able to identify the prior collecting bank, Fed New York. The research of the Check revealed to Fed Boston–Windsor Locks that it had been received for collection on December 20, 1988, from Fed New York–Jericho in a cash letter.

In accordance with its normal procedures, Fed Boston–Windsor Locks placed a "Look-

Up" sticker on the reverse side, summarizing the results of its research. The Look–Up Sticker reported that the Check had been located in a cash letter dated December 19, 1988, in the amount of $19,333,986.31 and appeared between a check for $600.00 and a check for $98.02.

On Friday, December 23, 1988, Fed Boston then returned the Check, with the Look–Up sticker attached, to Fed New York as a return item for processing. The Check was presented as a raw return, and was not qualified for automated processing.

The evidence presented established that it was reasonable, usual, and customary for federal reserve banks to have an adjustment department with experienced clerks in charge of researching items, including returned checks on which a depository bank is unidentifiable. Where a depository bank is unidentifiable, the check can be traced through forward collection records, specifically the detailed item lists appearing in the cash letter records. This is one of the purposes of sending cash letters which contain a list of all checks being transmitted for forward collection. By using these records, an adjustment clerk can locate the cash letter which reflects receipt of the item; this cash letter will tell the clerk which bank was the prior collecting bank.

When a federal reserve bank is given prior research information from a returning bank, such as that shown on the Look–Up sticker, the clerk's job is simplified because the outgoing cash letter is already identified. The bank then needs to trace back to the previous incoming cash letter to identify the bank of prior receipt, that is the bank from which it received the check.

On or about December 27, 1988, Fed New York received the Check from Windsor Locks. Fed New York did not identify the prior collecting bank, Fed Dallas, or the depositary bank, USAA FSB. Further, Fed New York did not notify any bank or customer that the Check had been returned. Instead, on or before Thursday, January 5, 1989, Fed New York presented the Check back to Fed Boston as a qualified return item, meaning that the Check was qualified for automated processing directly to CBT, as

a check for collection would be. (Fed New York's expert witness speculated that this occurred because CBT's ABA number appeared on the back of the Check. However, it was not in the form of a depositary bank endorsement and other information on the check should have made it clear that CBT was the drawee bank and not the depositary bank.) The Look–Up sticker remained on the Check, but Fed New York had placed an endorsement which partially overlapped the sticker. Because Fed New York transmitted the Check as a qualified item it was not examined individually.

On January 5, 1989, Fed Boston–Windsor Locks sent the Check to CBT as a qualified return item.

Between Thursday, January 5, 1989 and Friday, January 13, 1989, each time Fed New York handled the Check, the Check was qualified by Fed New York for automated processing, although the Check had previously been researched and still had the Look–Up sticker still in place.

On January 6, 1989, CBT returned the Check to Fed Boston–Windsor Locks in a qualified cash letter, and the Check was stripped and sent back to Fed New York as a return item.

On January 10, 1989, Fed New York sent the Check, stripped to CBT, in a qualified letter for returns to Fed Boston–Windsor Locks. That same day, Fed Boston–Windsor Locks sent the Check once again to CBT as a return item.

On January 11, 1989, CBT again sent the Check to Fed Boston–Windsor Locks as a qualified return item. And, on that same day, Fed Boston–Windsor Locks sent the Check to Fed New York with a regular return letter.

On Friday, January 13, 1989, Fed New York–Jericho received the Check loose in a delivery from Fed Boston.

On Thursday, January 19, 1989, for the third time, Fed New York returned the Check to Fed Boston because the Check bore Fed Boston's endorsement. The Check may not have been received in a qualified return letter, and it was sorted to a special handling

pocket and sent to the Adjustments Department at Fed Boston–Windsor Locks. The Check was researched, but the researchers again could not determine where the depositary bank was, so the item was returned as an adjustment item to Fed Boston–Windsor Locks' source of receipt, Fed New York, on January 20, 1989. The Check was put on an Advice of Charge (a memo relating to this one particular check) rather than in a return cash letter, so that it would not go around the circle again. The advice of charge contained an explanation of Fed Boston–Windsor Lock's original source of receipt for the Check collection from Fed New York on December 20, 1988.

On January 20, 1989, Fed New York received the check and debit advice from Fed Boston–Windsor Locks, which included the tracing information.

Sometime thereafter, Fed New York lost the Check.

On or about December 29, 1988, IMCO treated the Check as cleared and gave Trojanowski a final credit on the Account in an amount of shares equal to $75,000. In the banking business, a check is presumed to have cleared if not returned as dishonored.

On or about January 19, 1989, Trojanowski wrote a $75,000 check against the account payable to himself. The January 19 check was honored and the funds credited by IMCO on or about January 24, 1989 to the State Street Bank on which the check was drawn. (No evidence was available as to when Trojanowski removed the deposit from his bank).

On or about December 15, 1989, a year after the initial depositing of the check, USAA FSB was informed of the dishonor of the Check and that the original Check had been lost at some time. This notification came from Fed Dallas. Fed Dallas then debited $75,000 from USAA FSB's account with it.

On December 28, 1989, USAA FSB made a Late Return Item Claim that the Check had been returned late by the paying bank, CBT, and requested that its account be credited because "this late return caused us financial loss." After receiving a provisional credit on its account from Fed Dallas, on or about April 2, 1990, USAA FSB's claim was rejected by CBT, and the $75,000 again was debited from USAA FSB's Fed Dallas account. USAA FSB then charged back the $75,000 amount against IMCO's account.

IMCO was unable to charge back the full $75,000 against Trojanowski's Account, which held a balance of only $936.74. As a consequence of its agreement with Mutual Fund, IMCO was responsible for shortfalls on returned checks, so that IMCO was been damaged in the amount of $74,063.26.

Had Fed New York researched its cash letter at the end of 1988 or the beginning of 1989, it would have immediately identified the prior collecting bank as Fed Dallas' San Antonio branch. If the Check had been transmitted to that bank it would have had no difficulty in identifying USAA FSB as the depository bank, therefore alerting the interested parties that the Check had not cleared.

IMCO filed suit on December 21, 1990, and joined Fed New York on February 14, 1991.

A similar transaction was attempted by Trojanowski involving another mutual fund company. A loss on this check was avoided, however, because the bank of first deposit's endorsement was legible and the dishonored check was expeditiously returned.

### CONCLUSIONS OF LAW

This action was brought under the Expedited Funds Availability Act, 12 U.S.C. § 4001 et seq. (1989), and implementing regulations promulgated by the Board of Governors of the Federal Reserve System, including 12 C.F.R. §§ 210.1–210.28 (1994), also known as Regulation J, and 12 C.F.R. §§ 229.1–229.41 (1994), also known as Regulation CC. Regulation CC sets forth the various responsibilities of depository banks, paying banks, and returning banks (the banks that return dishonored checks from the paying bank to the depository bank) within the Federal Reserve System.

■ This action also arises under Article IV of the Uniform Commercial Code in effect in the State of New York, N.Y. UCC Law §§ 4–101 et seq. (McKinney 1995). Federal

statutes and regulations in the field of check collection and return preempt state laws only if inconsistent, and then only to the extent of the inconsistency. 12 U.S.C. § 4007(b) (1989); Regulation CC, 12 C.F.R. § 229.41 (1994). This Court has jurisdiction over the claims and the parties, and venue in this district is proper.

Regulation J, 12 C.F.R. § 210.6, Regulation CC, 12 C.F.R. § 229.38(a), and New York's Uniform Commercial Code, NY UCC § 4–202(1), set forth a standard of ordinary care to which the banks must adhere in the handling of checks for collection, including the handling of returned checks. Specifically, Regulation CC requires a bank to exercise "ordinary care and act in good faith in complying with the requirements of this subpart. A bank that fails to exercise ordinary care or act in good faith under this subpart may be liable to the depositary bank [or] the depositary's bank customer ...," the Plaintiff, in this case. 12 C.F.R. § 229.38(a) (1994).

Plaintiff IMCO argues that Fed New York failed to exercise ordinary care[2] in the handling of the Check and that this negligence was the cause of the losses that it ultimately sustained. Fed New York, on the other hand, asserts that USAA FSB failed to properly endorse the Check and this negligence was the cause of the loss, or, alternatively, a contributing cause of the loss.

I. *USAA FSB's failure to properly endorse the Check.*

■ The Expedited Funds Availability Act, 12 U.S.C. § 4008(b)(5)(A), requires each depositary institution and Federal Reserve bank to place its endorsement and other notations specified in the regulations of the Board on checks in positions specified in such regulations. Regulation CC, 12 C.F.R. 229.35(a), then requires all banks, other than paying banks, that handle a check during the forward collection process or that handle a returned check, to legibly endorse the check in accordance with the endorsement stan-

dards set forth in Appendix D. Thus, Regulation CC creates a chain of endorsements extending from the bank of first deposit through all collecting banks to the paying bank. And, should a check be returned for any reason, this chain extends back through all of the returning banks to the depositary bank.

Moreover, because of the importance of identifying the depositary bank in the case of a returned check, Regulation CC imposes special requirements on the depositary bank's endorsement. The depositary bank's endorsement must contain the bank's nine-digit routing number, set off by arrows at each end of the number and pointing toward the number; the bank's name/location; and the endorsement date. There is other optional information that may be provided. The endorsement must be written in dark purple ink or black ink and must be placed on the back of the check so that the routing number is wholly contained in the area 3.0 inches from the leading edge of the check to 1.5 inches from the trailing edge of the check. The leading edge is defined as the right side of the check looking at it from the front. The trailing edge is defined as the left side of the check looking at it from the front. 12 C.F.R. Pt. 229, App. D, p. 467, n. 1 (1994). Therefore, not only is the depositary bank's routing number set off by arrows, it is also located in an area specially reserved for its endorsement and none others.

Each subsequent collecting bank endorser is required to protect the identifiability and legibility of the depositary bank endorsement by including only its nine-digit routing number (without arrows), the endorsement date, and an optional trace/sequence number; using an ink color other than purple; and endorsing in the area on the back of the check from 0.0 inches to 3.0 inches from the leading edge of the check. Finally, each returning bank endorser must protect the identifiability and legibility of the depositary

---

**2.** Plaintiff IMCO also took the position at trial that Regulation CC, 12 C.F.R. § 229.31(b), imposed a duty on Fed New York to return the Check "expeditiously." As discussed below, because we find that the depositary bank was unidentifiable to Fed New York, we find that the expeditious return requirements of Regulation CC, 12 C.F.R. § 229.31, do not apply. Thus, our primary focus is on Plaintiff's alternative argument that Fed New York failed to exercise ordinary care in the handling of the Check in the return process.

bank endorsement by using an ink color other than purple and staying clear of the area on the back of the check from 3.0 inches from the leading edge of the check to the trailing edge of the check. Appendix D—Endorsement Standards, 12 C.F.R. Pt. 229 (1994).

This sensible system ensures that the depositary's bank's routing number will not be overwritten or obscured by any of the collecting or returning banks' endorsements, and thus dishonored checks can be easily returned to the depositary bank.

The endorsement standards of Regulation CC went into effect in September of 1988, just three months before the Check in this case began its long and circuitous journey through the federal reserve system. Unfortunately, in contravention of Regulation CC, it began this journey with the initial depositary bank endorsement in the wrong place.

USAA TA, a sister corporation of Plaintiff IMCO and as agent for Plaintiff, undertook to handle the depositing of Plaintiff's checks into its account with USAA FSB. In so doing, USAA TA placed the first endorsement on the back of the Check, a long number consisting of the date the Check was being processed, the account number, the sequence number and the time of day the Check was being processed, and did so in such a manner that it extended not only through the area reserved for the depositary bank but also through the area reserved for collecting banks. Additionally, USAA TA placed additional information in the form of a square stamp on the end of the Check reserved for collecting banks. The Check was then batched with other checks with a tape listing all of the checks and delivered by USAA TA to USAA FSB.

USAA FSB then compounded USAA TA's initial error. The IMCO checks were machine processed by the NCR 6760 reader sorter, which for one reason or another placed the endorsement of USAA FSB on this particular Check in the area reserved for collecting banks rather than in the area for the depositary bank. Additionally, because of the prior USAA TA endorsement, part of the USAA FSB endorsement was placed over the USAA TA endorsement, thus rendering it unreadable prior to the Check's ever reaching the first collecting bank.

Whether the misplacement of the USAA FSB endorsement was due to the reader sorter's mishandling of this one Check or whether this was a recurring problem with the reader sorter was unclear from the evidence presented. Regulation CC was relatively new, and witnesses for both sides testified as to difficulties encountered by banks in implementing the new endorsement standards. Regardless, it is clear that in this case the Check left USAA FSB with the depositary bank's endorsement in the wrong place and partially obliterated.

Thus, we agree with Defendant Fed New York that the Plaintiff and its sister corporations, whose negligence we impute to the Plaintiff, were negligent in the handling of the Check in that they failed to exercise ordinary care in endorsing the Check and in complying with Regulation CC. This negligence was a proximate cause of the losses sustained by Plaintiff, but not the only cause. Unfortunately, the saga of the Check's journey does not end here; nor does the negligence of the banks in handling the Check after its dishonor.

II. *Fed New York's failure to exercise ordinary care in handling the returned Check.*

Were we to hold that the depositary bank's failure to endorse the Check in the proper location placed 100 percent of the liability on the depositary bank, we would have to overlook any and all negligence of the collecting and returning banks in the subsequent handling of the Check. In other words, collecting banks and banks handling a returned check would not be required to exercise ordinary care, simply because the depositary bank endorsement was illegible. Such are not the requirements of Regulation CC or the Uniform Commercial Code.

■ Although Regulation CC does in fact relax the returning bank's responsibilities for the return of a check where the depositary bank is unidentifiable, it does not relieve the returning bank of its obligation to exercise ordinary care in its handling of the check.

Rather, it requires the returning bank, if it had been a collecting bank in the forward collection process, to send the returned check to a prior collecting bank, if the depositary bank cannot be identified. 12 C.F.R. § 229.31(b) (1994). The returning bank need not act expeditiously, as it would be required to do if the depositary bank could be identified, nor does the two-day/four-day test set forth in subsection (a) apply. *Id.* However, the returning bank must exercise ordinary care in its handling of a returned check and in its efforts to return the check upstream to the prior collecting bank.

■ Defendant Fed New York argues that a twenty-day/thirty day rule should control— that is, so long as it researched and took action with respect to the Check within twenty business days of its receipt, or within thirty calendar days, that it has met its obligations with respect to its processing of a returned check with an unidentifiable depositary bank. This it claims was its standard operating procedure at this time.

We reject this argument and decline to write into the regulations such a specific standard for determining whether ordinary care was exercised, where no specific standard otherwise exists. First, Regulation CC does not specify a time period for the handling of a returned check where the depositary bank is unidentifiable. Had the Board of Governors of the Federal Reserve System chosen to do so, they clearly could have done so, as they did in adopting a two-day/four-day test for the expeditious return of a checks with an identifiable depositary bank endorsement. *See* 12 C.F.R. § 229.31(a)(1) (1994). Second, the testimony presented at trial indicated that there were a variety of factors used by the federal reserve banks in assigning a priority to researching returned checks, not the least of which was the amount of the check.[3] Obviously, the larger the check, the greater the potential loss that could be sustained and, thus, the higher the priority that should be given to returning the check to the original depositary bank. In this case, the Check was for $75,000, a not insignificant sum of money. What consti-

tutes ordinary care with respect to the handling of a $75,000 returned check may well be different than with a $1,000,000 check or a $1.00 check. Third, there was substantial evidence presented as to Fed Boston's researching of the prior collecting bank on this particular Check, which took no more than two days. This contradicts the position of Fed New York that it should not be expected to complete this process in less than twenty business days.

Fed New York made several significant errors when it received the returned Check from Fed Boston. The Check bore a "Look–Up" sticker that told Fed New York that Fed Boston had received the Check in a cash letter from Fed New York on December 19, 1988, and that this particular Check was located between two other checks of specific amounts set forth on the sticker. Because of the Look–Up sticker, the Check was sent back to Fed New York as a "raw return," meaning that it was not eligible for automated processing, but had to be manually inspected. The information provided to Fed New York should have been sufficient for the research clerk to locate the incoming cash letter from Fed Dallas and to determine that Fed Dallas' San Antonio office was the collecting bank that had sent the Check to Fed New York in the forward collection process. In fact, eventually Fed New York did identify Fed Dallas as the prior collecting bank. We know nothing about how Fed New York was able to trace the Check back to Fed Dallas, since the relevant records are not available, and, indeed, at some point, the Check itself was lost. However, the important point is that Fed New York could have, and ultimately did, identify the prior collecting bank.

The purpose behind the requirement that the Check be sent back upstream is obvious. Since a cash letter accompanies the Check from institution to institution in the forward collection process, eventually the collecting bank that first received the Check from the depositary bank should be able to identify the bank of first deposit. The cash letters provide a back-up system to the chain of

---

**3.** Other factors included the number of new research items, any back log, the principal of first in-first out, staffing, and the difficulty of the research involved.

endorsements required by Regulation CC for identifying the prior collecting bank if an endorsement cannot be read.

Further, as witnesses testified at trial, a collecting bank in the same geographical area as the depositary bank is in a better position to decipher the endorsement of the depositary bank, since it would generally have far greater occasion to see this endorsement. The Commentary to section 229.31(b) also recognizes that a bank forward in the collection process may be better able to identify the depositary bank. 12 C.F.R. Pt. 229, App. E at 504 (1994). In this case, the USAA FSB endorsement was partially visible. Had Fed New York returned the Check more quickly to Fed Dallas–San Antonio, the San Antonio clerk would have recognized the endorsement because of the type style, the color of ink, the few visible letters, or some other unique identifying feature, that would otherwise be unknown to Fed New York. (Indeed, USAA is so active in San Antonio that it has its own savings bank, a fact that would be well known to Fed Dallas–San Antonio). If not, Fed Dallas should have been able to trace the Check through its incoming cash letter.

This, however, did not happen. The Defendant's expert witness hypothesized that the Fed New York clerk who first reviewed the returned Check, lifted the Look–Up sticker and saw CBT's ABA number. Apparently, banks can have more than one number, and in this case CBT had at least two ABA numbers, the one on the back of the Check being different than the one on the front. He then speculated that the clerk, possibly confused by the two different CBT numbers, mistook CBT's number on the back for that of the depositary bank. This scenario, however, overlooks the fact that the depositary bank is required to place arrows around its endorsement to distinguish it from the other endorsements, and CBT's endorsement had no such arrows. It also ignores the fact that the clerk should have realized that this was a return from CBT. Had CBT been both the depositary and paying bank—

an "on us" check—the Check probably would not have gone through the Federal Reserve System as this one did. Additionally, the clerk should have noted that the date on the Look–Up sticker—when Fed New York sent the Check to Fed Boston—pre-dated CBT's endorsement. Thus, CBT was further downstream in the collection process, not upstream as the bank of first deposit.

Indeed, even after the Fed New York clerk failed to perform the research to locate the cash letter by which Fed New York first received the Check, he or she then stamped another endorsement on top of the Look–Up sticker and returned it to Fed–Boston as a qualified return, meaning that it was qualified for automatic processing. Thus began the Check's circling back and forth between Fed New York, Fed Boston and CBT.

But for the negligence of Fed New York, we believe that it is more probable than not that the Check would have been returned to Fed Dallas—San Antonio, which then would have been able to determine its source of receipt and have returned the Check to USAA FSB prior to Mr. Trojanowski's withdrawing of the funds.[4] Fed New York first received the returned Check on or about December 27, 1988. We hold that, with the exercise of ordinary care, Fed New York could have researched and returned the Check to Fed Dallas in time for Fed Dallas to notify USAA FSB of the Check's return for insufficient funds prior to Mr. Trojanowski's withdrawal of the funds, sometime after January 24, 1989. Certainly, in no event, and Defendant Fed New York so concedes, was the return of the Check nearly one year later a reasonable amount of time.

### III. Comparative negligence.

■ Regulation CC sets forth a comparative negligence standard.

If a person, including a bank, fails to exercise ordinary care or act in good faith under this subpart in indorsing a check (§ 229.35), accepting a returned check or

---

**4.** At trial, no one was able to say when exactly Mr. Trojanowski actually came into possession of the $75,000. On January 24, 1989, IMCO credited State Street Bank's account with the $75,000.

However, it is unknown whether Mr. Trojanowski received this amount on that date or some date thereafter.

notice of nonpayment (§§ 229.32(a) and 229.33(c)), or otherwise, the damages incurred by that person under § 229.38(a) shall be diminished in proportion to the amount of negligence or bad faith attributable to that person. 12 C.F.R. § 229.38(c) (1994).

The Commentary to this section, in language directly applicable to this case, states:

> This section establishes a "pure" comparative negligence standard for liability under subpart C of this regulation. This comparative negligence rule may have particular application where a paying or returning bank delays in returning a check because of difficulty in identifying the depositary bank.... 12 C.F.R. Pt. 229, App. E, sec. 229.38(c), pp. 516–17 (1994).

The Commentary then cites various examples illustrating liability in such cases, including

> [i]f a depositary bank fails to use the indorsement required by this regulation, and this failure is caused by a failure to exercise ordinary care, and if a paying or returning bank is delayed in returning the check because additional time is required to identify the depositary bank or find its routing number, the paying or returning bank's liability to the depositary bank would be *reduced or eliminated.* *Id.* (emphasis added).

Accordingly, the negligence of the depositary bank may reduce or even eliminate the negligence of the returning bank in failing to research and return the check in a timely manner.

In this case, we find that the negligence of the Plaintiff IMCO and its agents was the proximate cause of forty percent (40%) of the Plaintiff's damages, and that the negligence of the Defendant Fed New York was the proximate cause of sixty percent (60%) of the damages. (We find no negligence on the part of Fed Boston). Thus, we reduce Plaintiff's recovery by forty percent (40%).

■ Both the statute and regulations recite in precise terms the amount of damages that a person is entitled to recover. The Expedited Funds Availability allows for "actual damages." 12 U.S.C. § 4010(a)(1) (1989). Regulation CC provides that the measure of damages for failure to exercise ordinary care is the "amount of the loss incurred, up to the amount of the check, reduced by the amount of the loss that party would have incurred even if the bank had exercised ordinary care." 12 C.F.R. § 229.38(a) (1994). Upon a showing of bad faith, the party may also recover "other damages, if any, suffered by the party as a proximate consequence." *Id.* Similarly, New York's Uniform Commercial Code, NY UCC Law § 4–103(5) (McKinney 1995), provides that the measure of damages for failure to exercise ordinary care in handling an item is "the amount of the item reduced by an amount which could not have been realized by the use of ordinary care." Where there is bad faith, "other damages, if any, suffered by the party as a proximate consequence" may be awarded. *Id.*

In this case, Plaintiff IMCO, which was responsible for shortfalls on all returned checks, was damaged in the amount of the $75,000, the amount of the Check, which was charged back against its account by USAA FSB, less the amount that it was able to recover from Trojanowski's account, $936.74. Thus, its total damages as a result of this dishonored Check were $74,063.26. Reducing this amount by forty percent due to Plaintiff's comparative negligence results in damages of $44,437.96, which we hereby award to Plaintiff.

IV. *Attorney's Fees and Prejudgment Interest.*

■ Plaintiff IMCO also asks us for an award of reasonable attorney's fees, pursuant to 12 U.S.C. § 4010(a)(3) (1989), and prejudgment interest pursuant to New York Civ. Prac.Law and Rules § 5001 (McKinney 1995). We deny Plaintiff's requests in both regards.

The Expedited Funds Availability Act does, in fact, provide for the award of reasonable attorney's fees "as determined by the court" in the case of "any successful action" to enforce the liability thereunder. This is a matter within the sound discretion of the court. Because we find the Plaintiff to be forty percent at fault for the damages it

sustained, we decline to award attorney's fees.

 We also decline Plaintiff's request for prejudgment interest. Neither the Expedited Funds Availability Act nor the regulations promulgated thereunder provide for the award of prejudgment interest. Where the federal statute governing liability does not specifically provide for prejudgment interest, this is a matter again committed to the sound discretion of the court. *Commercial Union Assur. Co., plc v. Milken,* 17 F.3d 608 (2d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 198, 130 L.Ed.2d 130 (1994). A decision to award prejudgment interest "should be a function of (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Wickham Contracting Co. v. Local Union No. 3, IBEW,* 955 F.2d 831, 833–34 (2d Cir.), *cert. denied,* 506 U.S. 946, 113 S.Ct. 394, 121 L.Ed.2d 302 (1992). In this case, we have found fault on both sides, which is the predominant reason we decline to award prejudgment interest. Additionally, we read Regulation CC and New York's Uniform Commercial Code as contemplating "other damages" only in cases of bad faith, which we have not found in this case and which, indeed, the Plaintiff does not even assert.

Plaintiff instead cites New York's Civ. Prac.L. & R. § 5001, claiming that it is entitled to prejudgment interest as a matter of law in that it was wrongfully deprived of its property. This statute does not compel the award of prejudgment interest in a case such as this, brought pursuant to a federal statute, and sounding in tort rather than contract.

Because we have found that Plaintiff is in part responsible for the losses sustained, and because the nature of the Defendant's liability sounds in tort rather than contract, we decline to award Plaintiff prejudgment interest in this case.

Accordingly, we award Plaintiff IMCO damages in the amount of $44,437.96, and direct the Clerk to enter judgment in favor of the Plaintiff in this amount.

**SO ORDERED.**